**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

| | | |
|---|---|---|
| MICHELLE R. KIRBY, | ) | NO. SA CV 14-1977-E |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **MEMORANDUM OPINION** |
| | ) | |
| CAROLYN W. COLVIN, ACTING | ) | **AND ORDER OF REMAND** |
| COMMISSIONER OF SOCIAL SECURITY, | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

Pursuant to sentence four of 42 U.S.C. section 405(g), IT IS HEREBY ORDERED that Plaintiff's and Defendant's motions for summary judgment are denied and this matter is remanded for further administrative action consistent with this Opinion.

**PROCEEDINGS**

Plaintiff filed a complaint on December 12, 2014, seeking review of the Commissioner's denial of benefits. The parties filed a consent to proceed before a United States Magistrate Judge on February 20, 2015. Plaintiff filed a motion for summary judgment and a separate

summary of facts on June 5, 2015.  Defendant filed a motion for
summary judgment on July 6, 2015.  The Court has taken both motions
under submission without oral argument.  See L.R. 7-15; "Order," filed
December 17, 2014.


**BACKGROUND AND SUMMARY OF ADMINISTRATIVE DECISION**


Plaintiff initially asserted disability based on a broken back
and other injuries sustained as a result of an automobile accident
(Administrative Record ("A.R.") 53-54, 202-03, 275-76, 350; see also
A.R. 251, 1681 (Plaintiff claiming on appeal and in a later disability
report also to suffer from bipolar disorder and memory loss from a
head injury)).  An Administrative Law Judge ("ALJ") previously found
that, despite severe physical impairments, Plaintiff retained the
residual functional capacity to perform a restricted range of light
work, limited in part to occasional reaching "at or above the shoulder
level" (A.R. 29).  The ALJ previously found that, with these
limitations, Plaintiff could perform work as a Cashier II, office
helper, and charge account clerk – jobs existing in significant
numbers in the national economy (A.R. 33-34 (adopting vocational
expert testimony at A.R. 67-69)).  The ALJ previously found Plaintiff
not disabled since her May 9, 2008 application date (A.R. 25, 34, 185-
91).


On November 1, 2012, the Court remanded the matter for an
evaluation of whether or not the vocational expert's testimony
identifying jobs Plaintiff supposedly could perform was consistent
with the information in the Dictionary of Occupational Titles, given

1  Plaintiff's reaching limitation.  See A.R. 1484-92; see also A.R. 1521

2  (Appeals Council's order of remand).

3

4       Following the Court's remand, the ALJ considered additional

5  evidence of Plaintiff's mental health treatment and found that

6  Plaintiff suffers from severe major depressive disorder and severe

7  anxiety (A.R. 1401, 1405).[1]  The ALJ limited Plaintiff's residual

8  functional capacity to "moderately complex tasks with [Specific

9  Vocational Preparation] 3-4; no hypervigilence; not in charge of

10  safety operation of others; and no intense interpersonal interaction

11  such as those [sic] encountered in taking complaints or those

12  encountered by law enforcement or emergency personnel" (A.R. 1403).

13  The vocational expert testified that a person with these limitations

14  could perform the same jobs previously identified (A.R. 1452-54).[2]

15  Accordingly, in a decision dated July 9, 2014, the ALJ again found

16  Plaintiff capable of performing the jobs of Cashier II, office helper,

17  and charge account clerk.  See A.R. 1398-1411 (adopting vocational

18  expert testimony at A.R. 1450-54).  The Appeals Council denied review

19  (A.R. 1347-50).

20  ///

21  _____

22       [1]    The ALJ previously had found no severe mental
    impairment (A.R. 27-29; see A.R. 1405, n.2).
23

24       [2]    The vocational expert testified that if a person were
    further limited to tolerating only occasional changes in a
25  routine work environment, or only occasional interaction with
    other people, that person would not be able to perform the jobs
26  identified (A.R. 1454).  The vocational expert further testified
    that if a person occasionally had anger outbursts or agitation
27  (i.e., up to five percent of the time) that would be noticeable
    to a supervisor, the person would not be able to perform any work
28  (A.R. 1455).

1
**STANDARD OF REVIEW**

2

3      Under 42 U.S.C. section 405(g), this Court reviews the

4  Administration's decision to determine if: (1) the Administration's

5  findings are supported by substantial evidence; and (2) the

6  Administration used correct legal standards.  See Carmickle v.

7  Commissioner, 533 F.3d 1155, 1159 (9th Cir. 2008); Hoopai v. Astrue,

8  499 F.3d 1071, 1074 (9th Cir. 2007).  Substantial evidence is "such

9  relevant evidence as a reasonable mind might accept as adequate to

10 support a conclusion."  Richardson v. Perales, 402 U.S. 389, 401

11 (1971) (citation and quotations omitted); see Widmark v. Barnhart,

12 454 F.3d 1063, 1067 (9th Cir. 2006).

13

14      If the evidence can support either outcome, the court may

15      not substitute its judgment for that of the ALJ.  But the

16      Commissioner's decision cannot be affirmed simply by

17      isolating a specific quantum of supporting evidence.

18      Rather, a court must consider the record as a whole,

19      weighing both evidence that supports and evidence that

20      detracts from the [administrative] conclusion.

21

22 Tackett v. Apfel, 180 F.3d 1094, 1098 (9th Cir. 1999) (citations and

23 quotations omitted).

24

25
**DISCUSSION**

26

27      Plaintiff contends that, in determining Plaintiff's residual

28 functional capacity, the ALJ failed properly to consider the medical

4

source opinions regarding Plaintiff's mental impairments.  As discussed below, the Court agrees.

I.   **Summary of the Relevant Medical Record**

   A.   **Treating Source Records**

The administrative record documents a history of depression.  In September of 2002, shortly after Plaintiff's automobile accident, Plaintiff was diagnosed with major depressive disorder (recurrent) (A.R. 545-47).  From late 2002 through at least December of 2003, Plaintiff's depression was treated with medication (i.e., Zoloft, Paxil, and Trazodone) and therapy visits (A.R. 547, 698-716, 751, 756-59, 1014, 1031-34, 1048).  On December 15, 2004, Plaintiff reported to her pain management doctor that she was feeling more irritable, sad and depressed (A.R. 394-95).[3]

On March 20, 2005, Plaintiff was involuntarily admitted to the hospital with major depression (severe) following an attempted suicide by overdose (A.R. 669-79, 954-65, 1290-1319).  Plaintiff was diagnosed with sedative and opioid dependence (A.R. 670, 675, 677).  On January 30, 2006, Plaintiff again presented to the emergency room for intentionally overdosing on medication (A.R. 1197-1209).  She was ///

---

[3]   State agency review physician Dr. Johnson opined on February 24, 2005, that Plaintiff did not have any medically determinable psychiatric impairment (A.R. 382).  At that time, Dr. Johnson appeared to assert that there was not even an allegation of a psychiatric impairment (id.).

diagnosed with bipolar disorder and substance abuse (A.R. 1197-98).[4]

After the ALJ's first adverse decision, Plaintiff also provided psychiatric treatment records from Providence Community Services, dated from August 6, 2009 through January 10, 2011 (A.R. 1325-46). According to these records, Plaintiff experiences depression, irritability, anger outbursts, and recurrent intrusive thoughts daily which interfere with Plaintiff's relationships (A.R. 1346). An update from November 16, 2009, reported minimal progress, given Plaintiff's inconsistent therapy attendance (A.R. 1346). Another update from September 20, 2010, similarly reported very little progress (A.R. 1344). Treatment notes from April 27, 2009, March 29, 2010, and September 20, 2010, indicate that Plaintiff's anger, irritability, and depression interfere with her ability to maintain relationships, her

---

[4]    Dr. Miriam Staub prepared a Complete Psychiatric Evaluation of Plaintiff dated August 13, 2008 (prior to the ALJ's first adverse decision) (A.R. 1265-70). Dr. Staub reviewed no psychiatric records (A.R. 1265). Plaintiff reported a history of overdosing in March 2005, followed by a stay in a rehabilitation program, and no difficulties with drug abuse since then (A.R. 1266; but see A.R. 46-47 (Plaintiff testifying that she used drugs until March 2007 when she found out she was pregnant)). Plaintiff reportedly denied a history of excessive alcohol use or street drug use (A.R. 1267). Plaintiff reportedly was not then under the care of a psychiatrist and reportedly was not then taking any psychotropic medications (A.R. 1266). Dr. Staub gave no psychiatric diagnosis and assigned a current Global Assessment of Functioning ("GAF") score of 85, suggesting "absent or minimal" symptoms (A.R. 1269). See American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders ("DSM-IV-TR") 34 (4th Ed. 2000 (Text Revision)). Dr. Staub opined that Plaintiff would have no mental limitations in her ability to work. See A.R. 1270 (listing the tasks that Plaintiff could do and assigning no limitations). State agency review physician Dr. R.E. Brooks similarly assigned no limitations, and review physician R. Tashjian agreed (A.R. 1272-85).

ability to care for herself and her daughter, and her ability to
obtain and maintain employment, follow through with daily activities,
and maintain housing (A.R. 1335, 1338, 1344).  Plaintiff reportedly
had been bipolar since age 15 and self-medicated with drugs in the
past (A.R. 1329, 1332).  Plaintiff was prescribed Zoloft and/or
Abilify (A.R. 1326-28, 1330-33).[5]

     Psychiatrist Dr. Jullyn Chargualaf treated Plaintiff from
December 19, 2011 through at least March 25, 2014 (A.R. 1723-49, 1762-
75, 1841-55, 1860-71).  Dr. Chargualaf initially diagnosed Plaintiff
with depressive disorder (not otherwise specified), posttraumatic
stress disorder, and pain disorder, and assigned a GAF score of 43

///

///

---

[5]   At the first hearing on May 19, 2010, Plaintiff
testified she was seeing a therapist once a week for depression
and grief, and she was taking Abilify (A.R. 48-50).  Plaintiff
then was 24 years old, had lost her husband on January 27, 2007,
and had delivered their daughter on October 19, 2007 (A.R. 43,
45-46).  Plaintiff had used alcohol and street drugs, but quit
when she found out she was pregnant (A.R. 46-47; see also A.R.
547, 700 (reporting use)).  Plaintiff was taking care of her
daughter with help from her mother (with whom Plaintiff lived)
and from friends, including one friend who had a licensed day
care facility (A.R. 45, 62-63, 351).

     In an exertion questionnaire submitted prior to the first
hearing, Plaintiff reported that she can wash dishes, cook quick
and easy meals, and do some laundry, but spends the bulk of her
days as a single parent taking care of her daughter (A.R. 304;
see also A.R. 325 (Plaintiff reporting that she needs help caring
for her baby due to Plaintiff's pain limitations); A.R. 346-47,
353-54 (declarations from Plaintiff's ex-boyfriend and case
worker stating that they each help her with chores and caring for
her daughter)).  Plaintiff reported that she has to lie down four
to five times each day to rest for an hour or two, and sits down
"constantly" to rest (A.R. 306).

(A.R. 1723).[6]  Plaintiff appeared anxious and tearful (A.R. 1724).

Dr. Chargualaf prescribed setraline (Zoloft) for Plaintiff's anxiety

and depression (A.R. 1725).  Plaintiff did not show for her next

appointment, and it was noted that she was not engaging very well with

staff (A.R. 1726).  At her next appointment on January 31, 2012,

Plaintiff reported no change in mood (A.R. 1727).  Dr. Chargualaf

stated that Plaintiff's affect was dysthymic, and he added a

prescription for duloxetin (Cymbalta) for Plaintiff's depressive

symptoms (A.R. 1727-28).  Dr. Chargualaf again assigned a GAF of 43

(A.R. 1727).  Plaintiff did not show for her next appointment (A.R.

1729).

    Plaintiff returned on March 5, 2012, reporting that she had not

started duloxetin and that she had to sell her pain medication to feed

her daughter (A.R. 1730).  Plaintiff asked for a Xanax prescription

for her anxiety (A.R. 1730).  According to Dr. Chargualaf, Plaintiff's

mood was anxious, her affect was agitated, her thought process was

"perseverating on Xanax," and her GAF again was 43 (A.R. 1730).  Dr.

Chargualaf noted that Plaintiff did not appear to be stable and had

not followed medication recommendations (A.R. 1731).  Dr. Chargualaf

was concerned that Plaintiff may be seeking medication and questioned

how much her symptoms were related to opioid withdrawal (A.R. 1731).

Dr. Chargualaf ordered no new medications (A.R. 1731).

---

[6]    Clinicians use the GAF scale to rate "psychological,
social, and occupational functioning on a hypothetical continuum
of mental health-illness."  DSM-IV-TR, p. 34.  A GAF between 41
and 50 indicates "[s]erious symptoms (e.g., suicidal ideation,
severe obsessional rituals, frequent shoplifting) OR any serious
impairment in social, occupational, or school functioning (e.g.,
no friends, unable to keep a job)."  Id.

1    Plaintiff returned on March 20, 2012, reporting that she had
2   started duloxetin (which supposedly was not helpful) and again asked
3   for Xanax (A.R. 1732).  Dr. Chargualaf refused, explaining that he was
4   not willing to prescribe benzodiazepines and was coordinating care
5   with Plaintiff's pain management (A.R. 1732).  Otherwise, Dr.
6   Chargualaf's stated observations duplicated those from Plaintiff's
7   March 5, 2012 visit (A.R. 1731-33).

8

9    Plaintiff returned on March 28, 2012, reporting that she was
10  three months pregnant (A.R. 1734).  Plaintiff said she had stopped
11  taking duloxetine, had decreased her Zoloft intake and was
12  experiencing episodes of rage (A.R. 1734).  According to Dr.
13  Chargualaf, Plaintiff's mood was "up and down," her affect was "easily
14  irritable," and her GAF again was 43 (A.R. 1734).  Dr. Chargualaf
15  indicated that Plaintiff had "moderate stability at best" and opined
16  that she would benefit from individual therapy (A.R. 1735).  Plaintiff
17  did not show for her next five scheduled appointments (A.R. 1737-41).

18

19   Plaintiff returned on May 11, 2012, reporting that she wanted to
20  discontinue her psychotropic medications due to her pregnancy (A.R.
21  1742).  Plaintiff stated she was "so much better" and her affect was
22  observed to be euthymic and appropriate (A.R. 1742).  Dr. Chargualaf
23  indicated that Plaintiff had "moderate stability that has largely
24  improved with treatment of her pregnancy and pain" and that Plaintiff
25  was "well supported by her partner" (A.R. 1742-43).  Her reported GAF
26  was still 43, however (A.R. 1742).
27  ///
28  ///

By her next appointment on September 25, 2012, Plaintiff was not taking any medications and she reported that she was having some difficulty controlling her emotions (A.R. 1744). Plaintiff said things were "hard with [her] boyfriend" and her affect was dysthymic and appropriate (A.R. 1744). Dr. Chargualaf indicated that Plaintiff had "moderate stability as she is struggling most with interpersonal difficulties at this time in light of pregnancy" (A.R. 1744-45). Dr. Chargualaf stated Plaintiff's GAF to be 41 (A.R. 1745). Dr. Chargualaf also stated that Plaintiff appeared "to have a pattern of unstable relationships, avoid abandonment, has intense anger and impulses, passive thoughts of self harming behavior, and a history of paranoia" (id.). Dr. Chargualaf planned to explore borderline personality disorder as a potential diagnosis (id.). Plaintiff's follow up visits from October 9, 2012, and October 30, 2012, report similar issues and findings (A.R. 1746-49).

Plaintiff did not show for her December 3, 2012 appointment (A.R. 1762). On December 6, 2012, Plaintiff reportedly was sad and angry about her relationship, and her affect was dysthymic and appropriate (A.R. 1763). Plaintiff reported getting help from her parents with childcare (A.R. 1763). Plaintiff said she had stopped breastfeeding and had resumed taking duloxetine (A.R. 1764). Dr. Chargualaf indicated Plaintiff was having "mild to moderate stability" and again assigned a GAF of 41 (A.R. 1763-64).

Plaintiff returned on January 10, 2013, reporting that she was getting angry and sad and was "perseverating" on her ex-husband (or ex-boyfriend) who was not involved with their baby (A.R. 1765).

Plaintiff said she had stopped taking duloxetine due to feeling "doped up," and had started aripiprazole (Abilify) (A.R. 1765).  Plaintiff reportedly was thankful her mother was helping with childcare (A.R. 1765).  Dr. Chargualaf diagnosed Plaintiff with major depressive disorder, recurrent, severe without psychotic features, posttraumatic stress disorder, and amphetamine abuse, noted that Plaintiff had "guarded stability," and assigned a GAF of 37 (A.R. 1765-66).[7] Plaintiff did not show for her next two appointments (A.R. 1767, 1770).

Plaintiff returned on April 1, 2013, reporting being tired and frustrated and struggling with childcare (A.R. 1771).  Plaintiff reportedly showed psychomotor agitation with a dysthymic, appropriate affect, and thought process that "easily perseverates" (A.R. 1771). Dr. Chargualaf again assigned a GAF of 37 (A.R. 1771).  Dr. Chargualaf prescribed aripiprazole (A.R. 1771-72).  Plaintiff did not show for her next appointment (A.R. 1773).  Dr. Chargualaf made similar findings on April 30, 2013 (A.R. 1774-75).

Plaintiff returned on May 14, 2013, saying that she just wanted help and apologizing for her demeanor during a previous visit (A.R. 1843).  Plaintiff reportedly had a "down" mood, dysthymic affect, and

---

[7]     A GAF score of 31-40 indicates "[s]ome impairment in reality testing or communication (e.g., speech is at times illogical, obscure, or irrelevant) OR major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood (e.g., depressed man avoids friends, neglects family, and is unable to work; child frequently beats up younger children, is defiant at home, and is failing at school)."  See DSM-IV-TR, p. 34.

thought process that "easily perseverates" (A.R. 1843).  Dr.
Chargualaf increased Plaintiff's aripiprazole and started Plaintiff on
buspirone for her anxiety (A.R. 1844).  Dr. Chargualaf again assigned
a GAF of 37 (A.R. 1843).  Plaintiff did not show for her next
appointment (A.R. 1845).

Plaintiff returned on July 2, 2013, reporting that she had been
"struggling with the father of her youngest daughter" (A.R. 1846).
She said she had tried taking buspirone but stopped due to nausea
(A.R. 1846).  According to Dr. Chargualaf, Plaintiff's mood was to
"set [her] boundary," her affect was dysthymic, and her thought
process was goal oriented (A.R. 1846).  Dr. Chargualaf again assigned
a GAF of 37 (A.R. 1846).  Dr. Chargualaf added an Abilify injection
and discontinued buspirone (A.R. 1847).  Plaintiff did not show for
her next appointment (A.R. 1848).

Plaintiff returned on August 19, 2013, reporting anxiety and
being scared to take her Abilify shot (A.R. 1849).  Dr. Chargualaf
assigned a GAF of 42 (A.R. 1849).  Plaintiff did not show for her next
two appointments (A.R. 1855, 1868).

Plaintiff returned on December 4, 2013, reporting that she was
"taking [her] control back" and that she felt better (A.R. 1869).
Plaintiff was participating in her church (A.R. 1869).  Dr. Chargualaf
noted that Plaintiff's affect was euthymic, there was "no psychomotor
agitation or retardation," and Dr. Chargualaf assigned a GAF of 44
(A.R. 1869).  Dr. Chargualaf discontinued aripiprazole and started
Plaintiff on Seroquel (A.R. 1870).  Plaintiff did not show for her

next appointment (A.R. 1867).

Plaintiff returned on January 22, 2014, reporting that she was exhausted and that the Seroquel was effective but made her groggy (A.R. 1864).  Dr. Chargualaf indicated that Plaintiff's affect was euthymic and again assigned a GAF of 44 (A.R. 1864).  Dr. Chargualaf discontinued Seroquel and prescribed mirtazapine (Remeron) (A.R. 1865).

Plaintiff returned on February 19, 2014, reporting that she felt better and had adjusted to the mirtazapine (A.R. 1860).  Dr. Chargualaf stated that Plaintiff's affect was euthymic and appropriate, again assigned a GAF of 44, and increased Plaintiff's mirtazapine (A.R. 1860-61).  Similarly, when Plaintiff returned on March 25, 2014, she reported that the medication was working, and she felt better and more self-confident (A.R. 1862).  Dr. Chargualaf continued Plaintiff's medication and again assigned a GAF of 44 (A.R. 1862).

**B.  <u>Medical Source Opinions</u>**

On February 5, 2013, Dr. Ernest Bagner, III, prepared a Complete Psychiatric Evaluation for Plaintiff (A.R. 1756-59).  During the preparation of this evaluation, Dr. Bagner did not review any medical records (A.R. 1756).  According to Dr. Bagner, Plaintiff reported poor relationships with friends and family and was tearful during the evaluation, with depressed mood and sad affect (A.R. 1757).  Plaintiff reported that in a usual day she makes coffee, gets her kids ready,

takes her five year old to school, comes home and takes care of her
baby, picks up her five year old from school, cooks dinner, watches
television, gives her kids a bath, and goes to bed (A.R. 1757).[8]  Dr.
Bagner diagnosed bipolar disorder (not otherwise specified) and
polysubstance dependence in remission, and assigned a GAF of 65 (A.R.
1758-59).[9]  Dr. Bagner opined that Plaintiff's ability to follow
detailed instructions was mildly limited, as was her ability to
interact appropriately with the public, co-workers, and supervisors
(A.R. 1759).  Plaintiff's ability to comply with job rules assertedly
was moderately limited, as was her ability to respond to changes in a

---

[8]     Similarly, on February 2, 2013, Plaintiff reported that
she lived alone and spent her days showering, dressing, dressing
her children, making a bottle for her three month old baby and
cereal for her five year old daughter, driving her five year old
to school, coming home, picking up her five year old from school
at 4 p.m., making dinner, and going to bed (A.R. 1692-93, 1695).
However, Plaintiff also reported that her mother helps her with
her children (A.R. 1693; see also A.R. 1704-06 (Plaintiff's
mother reporting that she helped with Plaintiff's childcare and
housework three to four days each week)).  Plaintiff reportedly
can make microwave meals or sandwiches, do dishes, and shop once
a week for food (A.R. 1694-95).  Plaintiff reportedly goes to
church once a week when she can, but gets depressed and isolates
and does not go to church when she is sad (A.R. 1696).  Plaintiff
does not spend time with others, explaining that she tends to
lash out at people (A.R. 1696-97).  Plaintiff reported that she
cannot follow spoken instructions very well, but can follow
written instructions if she can re-read them "over and over"
(A.R. 1697).  Plaintiff stated that she has no memory, completing
tasks is hard, concentration is hard, understanding is hard,
following instructions is hard, and getting along with others is
hard because of pain (A.R. 1697).  Plaintiff stated that she does
not handle stress or changes in routine well (A.R. 1698).

[9]     A GAF of 61-70 indicates "[s]ome mild symptoms (e.g.,
depressed mood and mild insomnia) OR some difficulty in social,
occupational, or school functioning (e.g., occasional truancy, or
theft within the household), but generally functioning pretty
well, has some meaningful interpersonal relationships."  DSM-IV-
TR, p. 32.

routine work setting, and to respond to work pressures (A.R. 1759).

Dr. Bagner gave Plaintiff a "fair" prognosis with continued treatment

(A.R. 1759).[10]


Dr. Chargualaf completed a "Medical Source Statement of Ability

to Do Work-Related Activities (Mental)" form for Plaintiff dated

February 21, 2013 (A.R. 1828-30).  Dr. Chargualaf indicated that

Plaintiff would have "moderate" restrictions in her ability to

understand and remember detailed instructions and carry out detailed

instructions, and "slight" restrictions relating to simple

instructions (A.R. 1828).  Dr. Chargualaf stated that Plaintiff "is

easily overwhelmed with too much information and can forget or become

distracted that [sic] affects her follow through.  Repetition is

helpful for her" (A.R. 1828).  Dr. Chargualaf indicated that Plaintiff

would have "moderate" restrictions in interacting with the public,

supervisors, co-workers, responding to work pressures and to changes

in a work setting (A.R. 1829).  Dr. Chargualaf explained that

Plaintiff "often [has] anger outbursts and baseline irritation that

limits communication and receptiveness.  Her reactivity can be extreme

at times" (A.R. 1829).

///

--------

[10]     On March 12, 2013, State agency psychologist Dr. Robert
Liss gave Dr. Bagner's assessment "great weight" as "the most
recent and comprehensive exam," opining that Plaintiff would be
capable of performing simple tasks, interacting with people,
adapting to ordinary workplace stress and change, and maintaining
concentration, persistence, and pace over the course of a full
work week.  See A.R. 1505-17 (explaining that Plaintiff's
concentration and persistence "can only reliably be maintained
for simple tasks").  Dr. Liss did not review any opinions from
Plaintiff's treating providers.

1    Dr. Chargualaf also completed two "Evaluation Form[s] for Mental
2   Disorders" dated February 21, 2013, and October 23, 2013 (A.R. 1831-
3   38).  In both forms, Dr. Chargualaf observed, <u>inter alia</u>, that
4   Plaintiff needs assistance to keep appointments, is often easily
5   tearful when sharing stressors with psychomotor agitation, has
6   depression and anxiety, "rages" when she gets angry or irritable out
7   of proportion to situations, and has a tendency to "perseverate" (A.R.
8   1831-33, 1835-37).  Dr. Chargualaf also stated that Plaintiff can
9   maintain daily activities a majority of the time, due to the need to
10  care for her children, but also stated that Plaintiff drops off her
11  children with relatives for care when Plaintiff is feeling overwhelmed
12  and needs assistance, and that Plaintiff often needs help to care for
13  her children due to her physical pain (A.R. 1833, 1837).  Dr.
14  Chargualaf described Plaintiff's social functioning as "often with
15  irritability," indicating that Plaintiff has difficulty communicating
16  with others, with no social supports and isolation a majority of the
17  time (A.R. 1833, 1837).  Dr. Chargualaf opined that Plaintiff's
18  ability to complete detailed, sustained, or multiple step tasks was
19  limited by her symptoms, with Plaintiff completing daily activities
20  only as necessary for her children (A.R. 1833, 1837).  Dr. Chargualaf
21  stated that Plaintiff's ability to adapt to work was "highly limited,"
22  because Plaintiff requires repeated reminders to attend to a task and
23  loses track of progress or required steps to complete a task (A.R.
24  1833).  In the February 21, 2013 form, Dr. Chargualaf opined that
25  Plaintiff's condition could be expected to improve in less than one
26  year, with appropriate and consistent treatment (A.R. 1838).  In the
27  October 23, 2013 form, by contrast, Dr. Chargualaf opined that
28  Plaintiff's condition could be expected to improve in one to two years

16

with appropriate and consistent treatment (A.R. 1834).[11]

## II.   Substantial Evidence Does Not Support the ALJ's Mental Residual Functional Capacity Determination.

In assessing Plaintiff's mental residual functional capacity, the ALJ gave "little weight" to the medical source opinions regarding Plaintiff's ability to work (A.R. 1407-08).  It is unknown how the ALJ then derived the limitations the ALJ incorporated into the assessment. No medical source defined, or expressed agreement with, these limitations.  If thus appears probable that the ALJ herself devised the limitations that supposedly would accommodate Plaintiff's severe major depressive disorder and severe anxiety.  Absent some expert assistance, the ALJ could not competently translate the medical evidence of record into a mental residual functional capacity assessment.

It is well-settled that an ALJ may not render his or her own medical opinion or substitute his or her own diagnosis for that of a physician.  See Tackett v. Apfel, 180 F.3d 1094, 1102-03 (9th Cir.

---

[11]   At the time of the second administrative hearing, that is, June 11, 2014, Plaintiff had two children and was living with her mother (A.R. 1435-36).  Plaintiff was taking Remeron for her depression and had been taking some form of medication (including Zoloft and Abilify) for her depression on and off since she was 15 years old (A.R. 1439-43).  Plaintiff said when she is depressed she cries a lot and isolates at home but is still able to take care of her children (A.R. 1440).  Plaintiff explained that her mother, mother-in-law, her ex-boyfriends, and a roommate had all helped her with childcare (A.R. 1443-48).  Plaintiff claimed she would not be able to care for her children without this assistance, due to her pain and depression (A.R. 1448).

1  1999) (ALJ erred in rejecting physicians' opinions and finding greater
2  residual functional capacity based on claimant's testimony that he
3  took a road trip; there was no medical evidence to support the ALJ's
4  determination); Balsamo v. Chater, 142 F.3d 75, 81 (2d Cir. 1998) (an
5  "ALJ cannot arbitrarily substitute his own judgment for competent
6  medical opinion") (internal quotation marks and citation omitted);
7  Rohan v. Chater, 98 F.3d 966, 970 (7th Cir. 1996) ("ALJs must not
8  succumb to the temptation to play doctor and make their own
9  independent medical findings"); Day v. Weinberger, 522 F.2d 1154, 1156
10 (9th Cir. 1975) (an ALJ is forbidden from making his or her own
11 medical assessment beyond that demonstrated by the record).

12

13     Rather than adopting her own lay assessment of Plaintiff's
14 limitations, the ALJ should have either relied on the medical source
15 statements of record, or further developed the record to provide some
16 competent, expert basis for the limitations assessed.  See generally
17 Brown v. Heckler, 713 F.2d 441, 443 (9th Cir. 1983) ("[T]he ALJ has a
18 special duty to fully and fairly develop the record to assure the
19 claimant's interests are considered.  This duty exists even when the
20 claimant is represented by counsel.") (internal citation omitted); see
21 also Mayes v. Massanari, 276 F.3d 453, 459-60 (9th Cir. 2001) ("An
22 ALJ's duty to develop the record further is triggered only when there
23 is ambiguous evidence or when the record is inadequate to allow for
24 proper evaluation of the evidence.") (citation omitted).
25 ///
26 ///
27 ///
28 ///

III. **Substantial Evidence Does Not Support the ALJ's Stated Reasons for Rejecting Dr. Chargualaf's Opinions.**

As indicated above, the ALJ gave "little weight" to Dr. Chargualaf's opinions.  The ALJ asserted that Dr. Chargualaf's opinions were "inherently inconsistent," and not well supported by the doctor's own treatment notes, which the ALJ claimed were "copied and pasted without much changes in mental status examinations" and assertedly showed "minimal to mild findings" on mental status examinations (A.R. 1406-07).  The ALJ purported to describe the alleged inconsistencies in Dr. Chargualaf's opinions:

> Although Dr. Chargualaf opined that the claimant is easily
> irritated and cannot complete tasks, he also stated that the
> claimant is capable of managing benefits in her own best
> interest and that she is capable of and actually maintains
> and carries out all and necessary daily activities to care
> for her children [without the constant reminders].
> Furthermore, his own treating notes documented no
> psychmomotor agitation and cooperative/calm behavior, except
> for April, May, July, and August 2013, where Dr. Chargualaf
> also commented that the claimant's psychosomatic symptoms
> are both related to normal child rearing as she recently had
> a baby resulting [in] decreased sleep and due to loss of her
> ex-boyfriend.

///

///

///

(A.R. 1407 (internal citations omitted)).[12]


A treating physician's conclusions "must be given substantial weight." <u>Embrey v. Bowen</u>, 849 F.2d 418, 422 (9th Cir. 1988); <u>see</u> <u>Rodriguez v. Bowen</u>, 876 F.2d 759, 762 (9th Cir. 1989) ("the ALJ must give sufficient weight to the subjective aspects of a doctor's opinion. . . .  This is especially true when the opinion is that of a treating physician") (citation omitted); <u>see also</u> <u>Orn v. Astrue</u>, 495 F.3d 625, 631-33 (9th Cir. 2007) (discussing deference owed to treating physician opinions).  Even where the treating physician's opinions are contradicted,[13] "if the ALJ wishes to disregard the opinion[s] of the treating physician he . . . must make findings setting forth specific, legitimate reasons for doing so that are based on substantial evidence in the record." <u>Winans v. Bowen</u>, 853 F.2d 643, 647 (9th Cir. 1987) (citation, quotations and brackets omitted); <u>see Rodriguez v. Bowen</u>, 876 F.2d at 762 ("The ALJ may disregard the treating physician's opinion, but only by setting forth specific, legitimate reasons for doing so, and this decision must itself be based on substantial evidence.") (citation and quotations omitted).

---

[12]    The ALJ also gave little weight to Dr. Bagner's opinion as supposedly not well supported by the treating notes or by Dr. Bagner's own examination (A.R. 1407-08).  The ALJ characterized the latter as "completely normal except depressed mood and sad affect" (<u>id.</u>).  The ALJ also regarded Dr. Bagner's opinion as contrary to Plaintiff's reported daily activities of taking care of her children, supposedly without "any complaints of difficulties" (<u>id.</u>).

[13]    Rejection of an uncontradicted opinion of a treating physician requires a statement of "clear and convincing" reasons. <u>Smolen v. Chater</u>, 80 F.3d 1273, 1285 (9th Cir. 1996); <u>Gallant v. Heckler</u>, 753 F.2d 1450, 1454 (9th Cir. 1984).  Here, the ALJ's reasoning fails under either standard.

An ALJ properly may discount a treating physician's opinions that are in conflict with treatment records or are unsupported by objective clinical findings.  See Bayliss v. Barnhart, 427 F.3d 1211, 1216 (9th Cir. 2005) (conflict between treating physician's assessment and clinical notes justifies rejection of assessment); Batson v. Commissioner, 359 F.3d 1190, 1195 (9th Cir. 2004) ("an ALJ may discredit treating physicians' opinions that are conclusory, brief, and unsupported by the record as a whole . . . or by objective medical findings"); Connett v. Barnhart, 340 F.3d 871, 875 (9th Cir. 2003) (treating physician's opinion properly rejected where physician's treatment notes "provide no basis for the functional restrictions he opined should be imposed on [the claimant]"); see also Rollins v. Massanari, 261 F.3d 853, 856 (9th Cir. 2001) (ALJ properly may reject treating physician's opinions that "were so extreme as to be implausible and were not supported by any findings made by any doctor . . ."); 20 C.F.R. §§ 404.1527(c), 416.927(c) (factors to consider in weighing treating source opinion include the supportability of the opinion by medical signs and laboratory findings as well as the opinion's consistency with the record as a whole).  A material inconsistency between a treating physician's opinion and a claimant's admitted level of daily activities also can furnish a specific, legitimate reason for rejecting a treating physician's opinion.  See, e.g., Rollins v. Massanari, 261 F.3d at 856.  However, the ALJ's reliance on these reasons for rejecting Dr. Chargualaf's opinions in the present case are not supported by substantial evidence.

First, while Dr. Chargualaf's treatment notes do contain some repetition, his notes (as well as the notes from his predecessors at

1  Providence Community Services) also contain detailed findings
2  documenting Plaintiff's ongoing depression, anger, irritability,
3  difficulty with interpersonal relationships, and (sometimes)
4  psychomotor agitation, symptoms which did not seem to improve until
5  Plaintiff's medication changes at the end of 2013.  Dr. Chargualaf
6  also explained his observations of Plaintiff's symptoms in detail in
7  his evaluation forms (A.R. 1831-38).  Dr. Liss reviewed at least some
8  of Dr. Chargualaf's treatment notes (though not Dr. Chargualaf's
9  opinions (see A.R. 1507, 1509-12)), and concluded that Plaintiff's
10 mental condition had improved with sobriety, but that Plaintiff
11 "continues to have severe [medically determinable impairments]" (A.R.
12 1512).  Unlike the ALJ, no doctor who reviewed Dr. Chargualaf's
13 treatment notes characterized the findings therein as "minimal" or
14 "mild."  Contrary to the ALJ's assertion, Dr. Chargualaf's treatment
15 notes reflect more than "minimal" or "mild" findings.  Accordingly,
16 the contrary stated reason for rejecting Dr. Chargualaf's opinions was
17 not a specific, legitimate reason supported by substantial evidence in
18 the record.

19

20      Second, the ALJ's reference to the allegedly "inherently
21 inconsistent" nature of Dr. Chargualaf's opinions is not a sufficient
22 basis for rejecting those opinions.  See Sprague v. Bowen, 812 F.2d
23 1226, 1230-31 (1987) (mere reference to purported inconsistencies does
24 not satisfy requirement that the ALJ set forth "specific, legitimate
25 reasons" for disregarding treating physician opinion).  Dr.
26 Chargualaf's opinion that Plaintiff would have difficulty completing
27 work tasks is not necessarily inconsistent with his observation that
28 Plaintiff supposedly is able to care for her children.  As summarized

above, Plaintiff repeatedly reported to Dr. Chargualaf (and to the Administration) that she has received significant help in caring for her children, and Dr. Chargualaf acknowledged as much in stating (and qualifying) his opinions.  The fact that Plaintiff may be capable of managing benefits in her own best interest also is not necessarily inconsistent with Dr. Chargualaf's opinion that Plaintiff would have difficulty completing work tasks.[14]  Finally, at the time that Dr. Chargualaf provided his opinions concerning Plaintiff's abilities, Dr. Chargualaf's notes reflected that Plaintiff _was_ exhibiting psychomotor agitation, so there is no inconsistency inhering in this observation. On the current record, the alleged inconsistences referenced by the ALJ do not furnish a specific, legitimate reason to reject Dr. Chargualaf's opinions.

///

///

---

[14]     "The Social Security Act does not require that claimants be utterly incapacitated to be eligible for benefits, and many home activities are not easily transferable to what may be the more grueling environment of the workplace, where it might be impossible to periodically rest or take medication."  Fair v. Bowen, 885 F.2d 597, 603 (9th Cir. 1989) (internal citations omitted).  "The critical differences between activities of daily living and activities in a full-time job are that a person has more flexibility in scheduling the former than the latter, can get help from other persons . . . , and is not held to a minimum standard of performance, as she would be by an employer."  Bjornson v. Astrue, 671 F.3d 640, 647 (7th Cir. 2012) (cited with approval in Garrison v. Colvin, 759 F.3d 995, 1016 (9th Cir. 2014)).  Before rejecting Dr. Chargualaf's findings that Plaintiff would have moderate impairment in her ability to carry out detailed instructions, respond to changes in the workplace, and respond to work pressures, the ALJ was obliged to consider whether Plaintiff's ability to perform activities of daily living such as basic child care (with the significant assistance of others) would translate to the demands of competitive, remunerative employment.

1

**CONCLUSION AND ORDER**

2

3        The errors discussed above were potentially prejudicial to the

4   ALJ's decision, such that the decision must be reversed.  <u>See</u> <u>McLeod</u>

5   <u>v. Astrue</u>, 640 F.3d 881, 887 (9th Cir. 2011) (reversal appropriate

6   where "the reviewing court can determine from the 'circumstances of

7   the case' that further administrative review is needed to determine

8   whether there was prejudice from the error").  When a court reverses

9   an administrative determination, "the proper course, except in rare

10  circumstances, is to remand to the agency for additional investigation

11  or explanation."  <u>INS v. Ventura</u>, 537 U.S. 12, 16 (2002) (citations

12  and quotations omitted); <u>Treichler v. Commissioner</u>, 775 F.3d 1090,

13  1101 n.5 (9th Cir. 2014) (remand for further administrative

14  proceedings is the proper remedy "in all but the rarest cases");

15  <u>Garrison v. Colvin</u>, 759 F.3d at 1020 (court will credit-as-true

16  medical opinion evidence only where, <u>inter alia</u>, "the record has been

17  fully developed and further administrative proceedings would serve no

18  useful purpose"); <u>Harman v. Apfel</u>, 211 F.3d 1172, 1180-81 (9th Cir.),

19  <u>cert. denied</u>, 531 U.S. 1038 (2000) (remand for further proceedings

20  rather than for the immediate payment of benefits is appropriate where

21  there are "sufficient unanswered questions in the record").  It is not

22  clear that the ALJ would be required to find Plaintiff disabled for

23  the entire claimed period of disability even if the rejected medical

24  opinions were fully credited.  <u>See</u> <u>Luna v. Astrue</u>, 623 F.3d 1032, 1035

25  (9th Cir. 2010); <u>see also</u> <u>Garcia v. Commissioner</u>, 768 F.3d 925, 932

26  (9th Cir. 2014).  Remand is proper where, as here, additional

27  administrative proceedings could remedy the defects in the decision.

28  <u>See</u> <u>Kail v. Heckler</u>, 722 F.2d 1496, 1497 (9th Cir. 1984).

24

1        Therefore, Plaintiff's and Defendant's motions for summary

2   judgment are denied and this matter is remanded for further

3   administrative action consistent with this Opinion.[15]

4

5        LET JUDGMENT BE ENTERED ACCORDINGLY.

6

7        DATED: July 31, 2015.

8

9                                    _____/s/_____

10                         CHARLES F. EICK
                    UNITED STATES MAGISTRATE JUDGE

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26   _____

27        [15]    The Court has not reached any other issue raised by
     Plaintiff except insofar as to determine that reversal with a
     directive for the immediate payment of benefits would not be
28   appropriate at this time.